**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aziz Aityahia, | No. CV-24-02126-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Envoy Air Incorporated, et al., | |
| Defendants. | |

In October 2022, Aziz Aityahia ("Plaintiff") applied for a pilot position with Envoy Air, Inc. ("Envoy") and received a conditional offer of employment.  However, after further review, Envoy rescinded its offer, prompting Plaintiff to file an age discrimination charge against Envoy with the Equal Employment Opportunity Commission ("EEOC").  While the EEOC's investigation was underway, Plaintiff again applied for a position with Envoy and was again rejected, prompting Plaintiff to file a second EEOC charge against Envoy, again alleging age discrimination but also alleging national origin discrimination and retaliation for filing the earlier charge.  After receiving a right-to-sue letter from the EEOC, Plaintiff—who is proceeding *pro se*—initiated this action, asserting claims under Title VII and the Age Discrimination in Employment Act ("ADEA") not only against Envoy but also against American Airlines, Inc. ("American").

American (but not Envoy) moved to dismiss the complaint, arguing that (1) Plaintiff failed to exhaust his administrative remedies and (2) the complaint failed to state a claim. (Doc. 23.)  In a June 2, 2025 order, the Court granted American's motion as to both issues

but also granted Plaintiff leave to amend.  (Doc. 61.)  Afterward, Plaintiff filed a First Amended Complaint ("FAC") containing additional allegations in support of his claims against American.  (Doc. 63.)  American has, in turn, again moved to dismiss.  (Doc. 67.)  For the reasons that follow, the motion is granted.

## BACKGROUND

I.    Relevant Facts

The following facts, presumed true, are derived from the FAC (Doc. 63) and other documents incorporated by reference or subject to judicial notice (Docs. 15, 23-3, 23-4, 24).

Plaintiff is of "Algerian National Origin" and was 57 years old at the time he filed this lawsuit.  (Doc. 63 ¶¶ 15, 48.)

Envoy is a subsidiary of Envoy Aviation Group, which in turn is a subsidiary of American Airlines Group, Inc. ("AAG").  (Doc. 15 at 2.)

American is a wholly owned subsidiary of AAG.  (Doc. 24 at 2.)

On October 21, 2022, after reviewing Plaintiff's pilot application, Envoy issued him a "conditional offer" for employment.  (Doc. 63 ¶ 13.)

On October 23-24, 2022,[1] upon invitation, Plaintiff attended an in-person "local recruitment event" in Phoenix, where his pilot application was reviewed by recruiters, including his pilot certificates which show his date of birth and Algerian national origin. (*Id.* ¶¶ 14-15.)

On October 24, 2022, Envoy recruiters interviewed Plaintiff, again reviewed his application, took his fingerprints, and had him sign "additional documents."  (*Id.* ¶ 17.) Plaintiff also submitted a drug test at some point in the following days.  (*Id.* ¶ 18.)  Plaintiff "was to be scheduled for pilot training at Envoy after Envoy received passing results from the drug test and from a required background check."  (*Id.* ¶ 19.)

"Instead, on December 8, 2022, the Envoy Air Pilot Recruitment Director mailed

---

[1]    In Plaintiff's EEOC charges, he appears to allege that the interview took place on November 11, 2022.  (Docs. 23-3, 23-4.)

[Plaintiff] a notice that his employment offer was rescinded because he did not pass the remaining portion of the hiring process."  (*Id.* ¶ 20.)

On June 2, 2023, Plaintiff filed his first charge against Envoy with the EEOC, alleging that Envoy, by rescinding his offer, had discriminated against him because of his age.  (Doc. 23-3.)  In the particulars section of the charge, Plaintiff alleged that Envoy offered no reason for its decision to rescind the offer and that Envoy had hired pilots under 40 years old with qualifications inferior to his own.  (*Id.*)

On December 7, 2023, while this charge was being investigated, Plaintiff applied for another position with Envoy and for a chance to attend another job fair and interview session.  (Doc. 63 ¶ 26.)

On December 8, 2023, Envoy notified Plaintiff via email that he did not qualify for the position.  (*Id.* ¶ 27.)

On December 18, 2023, Plaintiff filed a second charge against Envoy with the EEOC.  (Doc. 23-4.)  In this second charge, Plaintiff added allegations of national origin discrimination to his initial age discrimination charge and further alleged that his second pilot application was denied on the basis of his age, Algerian national origin, and as retaliation for his filing of the first charge.  (*Id.*)

On May 22, 2024, the EEOC issued Plaintiff a right-to-sue letter.  (Doc. 63 ¶ 32.)

II.     Procedural Background

On August 20, 2024, Plaintiff filed the complaint.  (Doc. 1.)

On June 2, 2025, the Court granted American's motion to dismiss the complaint.  (Doc. 61.)  First, as for the issue of administrative exhaustion, the Court emphasized the fact—undisputed by Plaintiff—that American was never mentioned in any of the EEOC documents, so "[c]onsequently, unless one of the . . . exceptions [identified in *Sosa v. Hiraoka*, 920 F.2d 1451 (9th Cir. 1990)], to the general rule [prohibiting Title VII and ADEA suits against parties not named in the EEOC charge] applies, Plaintiff has failed to exhaust his administrative remedies with respect to American and thus may not sue American."  (*Id.* at 9.)  The Court continued:

The Court concludes that the charges do not contain factual allegations or other information sufficient to trigger any of the exceptions. The charges do not allege that American was independently involved in the alleged discriminatory actions or contain any other allegations that give rise to an inference that American independently violated Title VII or the ADEA. Nor is there any evidence that American had notice of or participated in the EEOC proceedings. Last, the charges contain no allegations suggesting that American should have anticipated that it would be named in a Title VII or ADEA suit. Amidst the few concrete allegations contained in the charges, Plaintiff mentions only Envoy and Envoy employees. Even viewing these allegations with "utmost liberality," they are insufficient to satisfy Plaintiff's duty to exhaust administrative remedies as to American, AAG, or any other entity beyond Envoy.

(*Id.* at 9-10.)

Second, the Court also granted the motion to dismiss "on the separate ground that the Complaint fails to satisfy the pleading standard under Rule 8 of the Federal Rules of Civil Procedure" because American and Envoy are distinct corporate entities and thus American could only be held liable for Envoy's conduct under the joint-employer doctrine or the integrated-enterprise doctrine, which Plaintiff could not satisfy. (*Id.* at 10-11.) The Court elaborated:

The Complaint only mentions American three times: once in the case caption, another time when identifying the parties, and a third time in the request for relief, wherein Plaintiff requests "[r]apid path to captain position with American Airlines Full union (ALPA) benefits on day 1." The Complaint nowhere alleges that American had any role in, or knowledge[] of Envoy's allegedly discriminatory conduct. Additionally, although Plaintiff asserts in his response brief that American exercises "direct operational control" over Envoy and that the two entities "are operationally inseparable," no allegations to that effect appear in the Complaint. The Complaint thus fails to allege facts that would allow the Court to draw the reasonable inference that American could be held liable for Envoy's alleged discriminatory conduct under an "integrated enterprise" or joint-employment theory.

(*Id.*)

On June 16, 2025, Plaintiff filed the FAC. (Doc. 63.) The FAC adds several allegations seemingly intended to remedy the deficiencies outlined in the June 2, 2025 order:

- 4 -

¶ 9.  In its pilot recruitment materials, Envoy advertises a direct career path to "American" or "American Airlines" and guaranteed "flow" to "American" or "American Airlines."

¶ 10.  Envoy advertises using these themes heavily through channels and media including email, physical signs (like at recruitment fairs), on websites, and formal and informal speaking by Envoy representatives.

¶ 11.  [Plaintiff] encountered these themes in Envoy advertising and recruitment advertising in email, on signs, and spoken in person by representatives of Envoy, including by Director of Operations Robert Neider.

¶ 12.  [Plaintiff] wanted to be a pilot for Envoy because he understood that when Envoy hires a pilot, [American] simultaneously hires the pilot.

¶ 36.  Envoy provides flight services, including aircraft and staff, to [American] customers for [American].

¶ 37.  Most customers who receive those flight services believe they are provided by [American].

¶ 39.  [American] unconditionally enrolls a set proportion or number of Envoy pilots into every cohort of its entering pilot program.

¶ 40.  Envoy determines who it will send as its share of these enrollee pilots.

¶ 41.  [American] automatically accepts the enrollee pilots Envoy chooses.

¶ 42.  [American] does not interview the Envoy enrollee pilots or make them undergo any of the [American] recruitment process.

(Doc. 62-1 ¶¶ 9-12, 36-37, 39, 40-42.)

On July 7, 2025, American filed the pending motion to dismiss.  (Doc. 67.)  The motion is now fully briefed (Docs. 68, 69) and neither side requested oral argument.

After the motion became fully briefed, Plaintiff filed a "supplement" to his response brief (Doc. 80), which American has moved to strike (Doc. 82).

…

…

…

…

**DISCUSSION**

I.  Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When evaluating a Rule 12(b)(6) motion, "all well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (quoting *Iqbal*, 556 U.S. at 678). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.  Failure To Exhaust

A.  **The Parties' Arguments**

American argues the FAC "is still devoid of facts sufficient to show that Plaintiff exhausted his administrative remedies against [American]." (Doc. 67 at 6, capitalization omitted.) According to American, "the Ninth Circuit has recognized four exceptions to [the] general rule" that a claimant "may only sue those named in the EEOC charge" and none of those exceptions is applicable here. (*Id.* at 7.) More specifically, as for the first exception (*i.e.*, the unnamed party was involved in the acts giving rise to the EEOC claim), American contends it is inapplicable because, according to the FAC's allegations, "it is undisputed that [American] was in no way involved in Envoy's hiring processes for Plaintiff, which is the sole act giving rise to Plaintiff's EEOC claims." (*Id.* at 8.) American further argues that "Plaintiff's claims that [American] 'automatically accepts [Envoy]

1    enrollee pilots' and 'enrolls a set proportion or number of Envoy pilots into' its pilot
2    program" do not alter this conclusion because Envoy remains "free to hire its own pilots."
3    (*Id.*)  American relies on *Hutchinson v. Am. Fam. Mut. Ins. Co.*, 2013 WL 1340051 (D.
4    Ariz. 2013), for support.  (*Id.*)  As for the second exception (*i.e.*, the charge alleges facts
5    from which the court could infer that the unnamed party violated Title VII or the ADEA),
6    American argues it is inapplicable for essentially the same reasons: "It is impossible to
7    infer from the [FAC] that [American] violated Title VII or the ADEA given the
8    undisputable fact and Plaintiff's own admission that [American] is not in any way involved
9    in Envoy's recruiting, interviewing or hiring processes, including for Plaintiff."  (*Id.*)  As
10   for the third exception (*i.e.*, the unnamed party had notice of the EEOC conciliation efforts
11   and participated in the EEOC proceedings), American argues the FAC "lacks any evidence
12   that [American] had notice of or participated in the EEOC proceedings."  (*Id.* at 8-9.)  As
13   for the fourth exception (*i.e.*, the EEOC or the unnamed party should have anticipated that
14   the claimant would name the party in a Title VII or ADEA suit), American argues that "it
15   is incredulous to contend [American] or the EEOC should have anticipated that Plaintiff
16   would name [American] in this lawsuit."  (*Id.* at 9.)  American concludes: "Plaintiff has
17   offered no evidence to suggest the mere fact an attenuated corporate relationship existing
18   between [American] and Envoy is sufficient to trigger one of the four exceptions."  (*Id.*)

19          In response, Plaintiff argues that American's "integration with Envoy's pilot
20   pipeline and its role in benefitting from Plaintiff's exclusion" satisfies the exceptions
21   identified in *Sosa*.  (Doc. 68 at 2-3.)  Plaintiff further contends that under *Fort Bend Cnty.,*
22   *Texas v. Davis*, 587 U.S. 541 (2019), "exhaustion is a non-jurisdictional claim-processing
23   rule, subject to equitable exceptions" and appears to argue that the Court is thus not
24   required to dismiss the FAC on this basis.  (*Id.* at 3.)  Plaintiff also refers to a "joint consent
25   decree" arising from an earlier case in which "the EEOC sued both entities under the ADA
26   for failing to accommodate workers returning from medical leave."  (*Id.* at 4.)

27          In reply, American reiterates its arguments and further argues that Plaintiff's
28   assertion that American's "integration with Envoy's pilot pipeline and its role in benefitting

1   from Plaintiff's exclusion" triggers one or more of the exceptions is "circular and
2   conclusory" and therefore "not entitled to be assumed true." (Doc. 69 at 4-5.) American
3   also contends that "[w]hile Plaintiff is correct that the charge-filing requirement is not
4   jurisdictional, it is nonetheless a 'mandatory claim-processing rule' and 'precondition to
5   relief' under Title VII and the ADEA." (*Id.* at 5.) And as for the consent decree, American
6   notes that it specifically recognized that American and Envoy are "individual and separate"
7   operational entities. (*Id.* at 4.)

8       B.    **Analysis**

9       "[T]he general rule" is that "Title VII claimants may sue only those named in the
10  EEOC charge because only they had an opportunity to respond to charges during the
11  administrative proceeding." *Sosa*, 920 F.2d at 1458. Plaintiff did not name American in
12  either of his EEOC charges (Doc. 63 ¶¶ 25, 31) and the EEOC did not name American in
13  the right-to-sue letter it provided to Plaintiff (Doc. 1 at 5). Thus, unless an exception to the
14  general rule applies, Plaintiff cannot sue American in this action.[2]

15      As set out in bolded brackets below, the Court construes *Sosa* as identifying five
16  exceptions (not four, as American contends) to the general rule:

17          The district court correctly identified the general rule that Title VII claimants
18          may sue only those named in the EEOC charge because only they had an
            opportunity to respond to charges during the administrative proceeding.
19          Nonetheless, **[1]** Title VII charges can be brought against persons not named
20          in an E.E.O.C. complaint as long as they were involved in the acts giving rise
            to the E.E.O.C. claims. Further, **[2]** where the EEOC or defendants
21          themselves "should have anticipated" that the claimant would name those
            defendants in a Title VII suit, the court has jurisdiction over those defendants
22          even though they were not named in the EEOC charge. . . . Three other well-
            established "exceptions" to the general rule [also] may apply to Sosa's case
23          . . . **[3]** [I]f the respondent named in the EEOC charge is a principal or agent
24          of the unnamed party, or if they are "substantially identical parties," suit may
            proceed against the unnamed party. **[4]** [S]uit may proceed if the EEOC
25          could have inferred that the unnamed party violated Title VII. **[5]** [I]f the
26

27  _____
    [2]    Plaintiff's contention that the charge-filing requirement is non-jurisdictional does
28  not alter this outcome. As the Supreme Court explained in *Fort Bend*, this requirement is
    still "mandatory" if "a party properly raises it." 587 U.S. at 549 (cleaned up). Here,
    American properly raised the issue of administrative exhaustion in its motion to dismiss.

- 8 -

unnamed party had notice of the EEOC conciliation efforts and participated in the EEOC proceedings, then suit may proceed against the unnamed party.

*Sosa*, 920 F.2d at 1458-59 (cleaned up).[3]  Each exception is addressed below.

1.    Involvement In The Acts Giving Rise To The EEOC Claims

The first exception is inapplicable here.  The FAC does not allege that American was involved in the challenged hiring decisions, which are the acts giving rise to Plaintiff's EEOC claims.  In fact, several allegations in the FAC affirmatively indicate that American was not involved in those decisions.  For example, the FAC alleges that American "*unconditionally* enrolls a set proportion or number of Envoy pilots into every cohort of its entering pilot program," that "*Envoy determines* who it will send as its share of these enrollee pilots," and that "[American] *automatically* accepts the enrollee pilots Envoy chooses."  (Doc. 63 ¶¶ 39-41.)  Such allegations indicate that American played no role in the hiring process and are thus inconsistent with the notion that American was involved in the acts giving rise to Plaintiff's EEOC claims.

Plaintiff's arguments regarding American's "integration" with Envoy's pilot pipeline and "its role in benefitting from Plaintiff's exclusion" do not alter this conclusion.  Plaintiff's argument appears to be that by automatically hiring a set number of Envoy pilots "into every cohort of its pilot program" (Doc. 63 ¶ 39), American benefits from Envoy's hiring decisions and thereby ratifies Envoy's hiring decisions in a manner that qualifies as "involvement" in those decisions.  Even assuming this involvement-via-ratification theory had any basis in law, it would fail because Plaintiff does not plausibly plead ratification.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with . . . authority."  *Husayn v. Mitchell*, 142 F.4th 667, 677 (9th Cir. 2025) (quoting Restatement (Third) of Agency § 4.01(1)).  For ratification to occur, "an alleged agent must first act or purport to act on behalf of the principal.  Then, the principal can ratify the alleged agent's acts by knowing acceptance of

---

[3]    To the extent the June 2, 2025 order did not specifically address all of these exceptions, this order clarifies that no exception is satisfied.

the benefit of the actions." *Id.* (cleaned up). "To prove this form of ratification, there must

be an objectively or externally observable indication that the principal has exercised choice

and has consented to the acts of the purported agent. That means that the principal must

have knowledge of material facts, also described as actual knowledge." *Henderson v.*

*United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019) (cleaned up).

Alternatively, a principal can also "ratify the acts of a third party . . . through willful

ignorance. Under the willful ignorance theory, the principal may not know the material

facts, but has ratified with awareness that such knowledge was lacking. In effect, the

principal can ratify the act of a third party—thereby making the third party the principal's

agent—even if it does not know all the material facts, but it must be aware that it does not

know the material facts and ratify anyway." *Id.* at 1073-74 (cleaned up). "A principal has

assumed the risk of lack of knowledge if 'the principal is shown to have had knowledge of

facts that would have led a reasonable person to investigate further, but the principal

ratified without further investigation.'" *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d

1010, 1014 (9th Cir. 2018) (quoting Restatement (Third) of Agency § 4.06 cmt. d).

Even assuming that Envoy, through its branding and communications, acts or

purports to act on behalf of American, the FAC nowhere alleges that American knew

anything about Envoy's hiring practices generally or about Envoy's decisions with respect

to Plaintiff specifically. Nor does the FAC allege that American knew of facts that "would

have led a reasonable person to investigate further," such that American could be said to

have assumed the risk. *Kristensen*, 879 F.3d at 1015 ("Although AC Referral was an agent

of Click Media, Kristensen presented no evidence that Click Media had actual knowledge

that AC Referral was sending text messages in violation of TCPA. Nor is there any basis

to infer that Click Media assumed the risk of lack of knowledge, because Kristensen did

not present evidence that Click Media 'had knowledge of facts that would have led a

reasonable person to investigate further,' but ratified AC Referral's acts anyway without

investigation."). Indeed, the FAC acknowledges that American "does not interview" the

Envoy pilots "or make them undergo any of the [American] recruitment process." (Doc.

1    63 ¶ 42.)

2        2.    Should Have Anticipated Being Sued

3        As noted, the second exception identified in *Sosa* is when "the EEOC or defendants

4    themselves 'should have anticipated' that the claimant would name those defendants in a

5    Title VII suit." *Sosa*, 920 F.2d at 1459.  This exception is inapplicable here because the

6    FAC does not allege facts sufficient to establish that either American or the EEOC should

7    have anticipated American being named in a Title VII or ADEA suit for Envoy's conduct.

8    This conclusion flows from the analysis regarding the other exceptions—if American was

9    not involved in the acts giving rise to the EEOC claims, did not ratify Envoy's conduct,

10   did not have an agency relationship with Envoy, did nothing to raise an inference that it

11   directly violated Title VII or the ADEA, and was not aware of and did not have any

12   involvement in the underlying EEOC proceedings, no anticipation of being sued could have

13   arisen.

14       To the extent Plaintiff's reference to the consent decree was intended to be an

15   argument regarding the anticipation of suit, it is unavailing.  This particular consent decree,

16   issued in November 2017, specifically identified American and Envoy as separate entities.

17   *E.E.O.C v. Am. Airlines, Inc. and Envoy Air Inc*., 2017 WL 6451442 (D. Ariz. 2017)

18   ("Provisions of this Consent Decree ('Decree') applicable to 'Defendants' shall apply

19   separately to American and Envoy as individual and separate carriers.   Accordingly,

20   American is responsible only for fulfilling obligations involving American employees, and

21   likewise, Envoy is responsible only for obligations involving Envoy employees.").  The

22   issuance of this consent decree would not have made American anticipate that, in future

23   lawsuits, it could be sued for alleged discriminatory conduct committed by Envoy.

24       3.    Agency Relationship Or "Substantially Identical" Parties

25       As noted, the third exception identified in *Sosa* is that "if the respondent named in

26   the EEOC charge is a principal or agent of the unnamed party, or if they are 'substantially

27   identical parties,' suit may proceed against the unnamed party." *Sosa*, 920 F.2d at 1459.

28   "To determine whether an agency relationship exists for purposes of defining federal law,

we look to the Restatement (Third) of Agency, which . . . remains the most current articulation of the common law of agency." *Husayn*, 142 F.4th at 675. "An agency relationship arises when a principal agrees with an agent that the agent shall act [1] on the principal's behalf and [2] subject to the principal's control.'" *Id.* (cleaned up). "Alternatively, even when a principal and alleged agent do not reach such an agreement before the alleged agent acts, a principal can ratify an agency relationship by affirming a prior act done by another." *Id.* (cleaned up).

The FAC does not allege facts sufficient to trigger this exception. The FAC does not explicitly allege that Envoy acted as an "agent" of American. Nor do the details regarding the relationship between American and Envoy alleged in the FAC—such as that American and Envoy are both subsidiaries of AAG, that American pays Envoy pilots, and that American hires Envoy pilots through its "pilot pipeline" (Doc. 63 ¶¶ 33-34, 38, 39-43)—support this conclusion. Notably absent from the FAC is any allegation indicating an agreement between Envoy and American that Envoy was subject to American's control. To the contrary, the FAC affirmatively alleges that Envoy formulated its own hiring processes and procedures and that American had no role whatsoever in them. *Cf. Hutchinson*, 2013 WL 1340051 at *7-8 (concluding that "the Court does not find that Wadlund acted as American Family's agent pursuant [to] Title VII" where "Wadlund's daily activities were not supervised [by American Family] and he had the authority to implement whatever measures he deemed necessary to meet American Family's minimum goals including the hiring of additional staff," Wadlund could "hire whomever he chooses without American Family's influence as long as that employee does not sell or represent American Family products to the public," and Wadlund did not "require approval from American Family to terminate the employment of one of his employees").

*Courtland v. GCEP-Surprise, LLC*, 2013 WL 3894981 (D. Ariz. 2013), is particularly instructive here. There, a plaintiff working for a franchised Buffalo Wild Wings restaurant sued the franchisee, GCEP-Surprise ("GCEP"), along with the franchisor, Buffalo Wild Wings Inc. and Buffalo Wild Wings International (collectively "BWWI"),

for discrimination in violation of Title VII.  *Id.* at *1.  Although not directly employed by BWWI, Courtland believed at all times during her employment that she was an employee of BWWI because "she was given on-the-job training by persons who were identified to her as trainers from BWWI's corporate office," "was given an employee handbook that contained the BWWI logo," and "was told by her superiors that she was an employee of BWWI" and also because "the Restaurant was dressed with Buffalo Wild Wings trademarks."  *Id.* at *1-2.  BWWI moved for summary judgment, arguing that it could not be held liable for Courtland's allegations of employment discrimination "because BWWI was not Courtland's employer nor was GCEP its agent for purposes of vicarious liability."  *Id.* at *2.  The court agreed.  *Id.* at *10.  In analyzing whether GCEP was acting as the agent of BWWI, the court applied the control test and concluded that BWWI did not exert sufficient control over GCEP.  *Id.* at *7 ("BWWI did not have control over the daily conduct of the Restaurant's managerial staff. . . .  In practice, GCEP had sole responsibility for hiring, training, supervising, scheduling, compensating, reviewing, and terminating employees as well as addressing HR issues or grievances.").  For similar reasons, Plaintiff has not plausibly alleged an agency relationship here.

Nor has Plaintiff plausibly alleged the existence of apparent authority.  "Apparent authority . . . is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation."  Restatement (Third) of Agency § 3.03.  *See also McCurley v. Royal Seas Cruises, Inc.*, 2022 WL 1012471, *2 (9th Cir. 2022).  "In other words, apparent authority can never be derived from the acts of the agent alone; the evidence must show that the alleged principal represented another as his agent and that the person who relied upon the manifestation was reasonably justified in doing so."  *Courtland*, 2013 WL 3894981 at *9. *See also Myers v. Bennett L. Offs.*, 238 F.3d 1068, 1073 n.2 (9th Cir. 2001) ("A party claiming apparent authority of an agent must prove (1) that the acting party subjectively believed that the agent had authority to act for the principal and (2) that the subjective belief

in the agent's authority was objectively reasonable.").

*Courtland* is again instructive. After concluding that no actual agency relationship existed between BWWI and GCEP, the court analyzed whether liability could attach under the theory of apparent authority. *Courtland*, 2013 WL 3894981 at *9. The court rejected this theory. *Id.* at *9-10. First, the court cited a wealth of authority supporting the proposition that mere use of franchisor "logos, signage and marketing material" by a franchisee "is not sufficient manifestation by the franchisor to establish apparent agency." *Id.* at *9. The court also determined that Courtland's testimony that she "was always told by [her] superiors that [she] was an employee" of BWWI failed to establish apparent authority, because such testimony did not show that the conduct of GCEP, the supposed agent, was "traceable to manifestations by BWWI." *Id.*

Here, too, Plaintiff has not plausibly alleged that Envoy had apparent authority to act as the agent of American. First—and most crucially—the FAC nowhere alleges that American made any manifestations that Envoy was its agent. The FAC identifies various manifestations by *Envoy* that, in Plaintiff's view, suggest an agency relationship. (*See, e.g.*, Doc. 63 ¶ 9 ["In its pilot recruitment materials, Envoy advertises a direct career path to 'American' or 'American Airlines' and guaranteed 'flow' to 'American' or 'American Airlines.'"]; *id.* ¶ 10 ["Envoy advertises using these themes heavily through channels and media including email, physical signs (like at recruitment fairs), on websites, and formal and informal speaking by Envoy representatives."]; *id.* ¶ 11 ["[Plaintiff] encountered these themes in Envoy advertising and recruitment advertising in email, on signs, and spoken in person by representatives of Envoy, including by Director of Operations Robert Neider."].)[4] But to create apparent authority, the manifestations must come from the

---

[4]      In his response brief, Plaintiff adds the following assertion: "Following the January 29 2025 midair collision, between a military helicopter and American Airlines flight 5342 a passenger plane operated by PSA Airline the sister company of Envoy Air, near the Washington DC airport, it was Mr. Robert Isom, the CEO for American Airlines who appeared publicly and made a statement offering support to the families of the victims." (Doc. 68 at 4.) Putting aside the fact that Plaintiff cannot use his response brief to shore up deficiencies in the FAC, this assertion does not come close to establishing an agency relationship or apparent authority with respect to the hiring decisions at issue here.

1    principal (American) rather than from the purported agent (Envoy).

2         Finally, even assuming some of these manifestations could be ascribed to American,

3    they would fail to plausibly establish apparent authority for an additional reason: they are

4    akin to the sort of "logos, signage and marketing material" deemed insufficient in

5    *Courtland*.  The FAC's only other relevant allegation is that Plaintiff "wanted to be a pilot

6    for Envoy because he understood that when Envoy hires a pilot, [American] simultaneously

7    hires the pilot." (Doc. 63 ¶ 12.)  But this allegation constitutes nothing more than Plaintiff's

8    "subjective belief" that Envoy operated as American's agent, which is insufficient.  *Myers*,

9    238 F.3d at 1073 n.2.

10              4.    Inference That The Unnamed Party Violated Title VII Or The ADEA

11        As noted, the four exception identified in *Sosa* is that "suit may proceed if the EEOC

12   could have inferred that the unnamed party violated Title VII."  *Sosa*, 920 F.2d at 1459.

13        This exception appears to originate from *Bernstein v. Aetna Life & Cas.*, 843 F.2d

14   359 (9th Cir. 1988).  There, the Ninth Circuit allowed a plaintiff to sue his supervisor under

15   Title VII, even though the plaintiff failed to name the supervisor in his EEOC charge,

16   because the EEOC charge arose from a failure to meet probationary requirements

17   established by the supervisor in question.  *Id.* at 362.  The court concluded that "[t]his

18   satisfies the requirement of alleging facts from which the court could infer that the

19   unnamed party violated Title VII or the ADEA."  *Id.*  The court also clarified that "[e]ven

20   if we were to apply the rule that Title VII charges can be brought against persons not named

21   in an EEOC complaint as long as they were involved in the acts giving rise to the EEOC

22   claims, we would reach the same result."  *Id.* at 362 n.1.

23        The same cannot be said here.  Plaintiff's two EEOC charges only mention

24   Plaintiff's experiences with Envoy, and there is no reason the EEOC would have inferred

25   from that information that a distantly related corporate entity violated Title VII or the

26   ADEA.  *Marks v. Able Body Lab.*, 2009 WL 10673629, *3 (D. Ariz. 2009) ("Manheim is

27   a separate entity from Able Body, and naming Able Body in the EEOC charge does not

28   exhaust administrative remedies with respect to Manheim."); *Nowick v. Gammell*, 351 F.

Supp. 2d 1025, 1036 (D. Haw. 2004) ("Plaintiff's EEOC charge does not mention KHVO, or even hint that KHVO is involved in the underlying facts, but rather asserts that she was sexually harassed at work by Dave Gammell and retaliated against by her supervisor, Linda Beauchamp, who were both employees of MLVO. Thus, Plaintiff does not allege facts in her EEOC charge from which it can be inferred that KHVO violated Title VII, and the Court accordingly finds that this exception does not apply.").

5.    Notice Of, And Participation In, EEOC Proceedings

As noted, the fifth exception identified in *Sosa* is that "if the unnamed party had notice of the EEOC conciliation efforts and participated in the EEOC proceedings, then suit may proceed against the unnamed party." *Sosa*, 920 F.2d at 1459.

This exception is inapplicable here because Plaintiff does not allege that American had notice of, or participated in, the EEOC proceedings. To the extent Plaintiff argues that the FAC's allegations as to the general "integration" between American and Envoy satisfy this exception, Plaintiff is mistaken. *Marks*, 2009 WL 10673629 at *3; *Nowick*, 351 F. Supp. 2d at 1037 ("KHVO did not participate in the EEOC proceedings. As discussed *supra*, even though Adventure Resorts and Westpro were the sole members of both KHVO and MLVO, KHVO is a separate legal entity from its members. Thus, this exception does not apply to this case.").

6.    Conclusion

Because Plaintiff did not name American in his EEOC charges and has failed to establish the applicability of any of the exceptions to the general rule prohibiting plaintiffs in Title VII and ADEA cases from suing parties not named in the EEOC charges, Plaintiff's claims against American are dismissed based on a lack of administrative exhaustion.

III.    Failure To State A Claim

Although the analysis could end there, American is also entitled to dismissal for the independent reason that, separate and apart from the issue of administrative exhaustion, the FAC fails to state a claim for relief against American.

…

A.    **The Parties' Arguments**

American argues that the FAC "still lacks facts sufficient to satisfy Rule 8's pleadings standard and demonstrate [American] could be held liable for Envoy's actions." (Doc. 67 at 10, capitalization omitted.)  American emphasizes that Plaintiff never sought or obtained employment with American, so "the presumption is that [American] is not Plaintiff's 'employer' [for Title VII or ADEA purposes] and thus cannot be liable for Plaintiff's Title VII or ADEA claims." (*Id.* at 11.)  American further argues that Plaintiff cannot establish either of the exceptions to this presumption—the integrated enterprise exception or joint-employer exception. (*Id.* at 12-13.)  As for the former, American argues that the FAC fails to allege that American and Envoy were an integrated enterprise because "[e]ven giving Plaintiff the benefit of the doubt, that there is some interrelation of operations between [American] and Envoy by virtue of the alleged facts that [American] pays Envoy pilots and Envoy provides aircrafts and staff to [American] and its customers, establishing only this one factor is not enough to prove [American] and Envoy are an integrated enterprise.  Three of the four factors, including the most essential factor (centralized control of labor relations) weigh against an integrated enterprise and thus [American] cannot be liable for Envoy's actions under such a theory." (*Id.* at 12, cleaned up.)  American also argues, for many of the same reasons, that the FAC fails to allege facts sufficient to satisfy the latter exception, and further argues that "even if Envoy and [American] are somehow found to be joint employers (which [American] vehemently denies), [American] is still not liable for the actions of Envoy" because the FAC contains no well-pleaded allegations that American "knew or should have known that Envoy would not hire Plaintiff for discriminatory and retaliatory reasons." (*Id.* at 12-13.)

In response, Plaintiff contends that American "directly benefits from Envoy's pilot recruiting and maintains influence over pilots' career progression through its flow-through pathway." (Doc. 68 at 2.)  Plaintiff argues that by alleging that American "automatically accepts" Envoy enrollees, that American "pays Envoy pilots, an indicator of economic interdependence," and that American "and Envoy share branding and operations under

- 17 -

[AAG]," the FAC alleges facts sufficient to "support a joint employer theory under *EEOC v. Global Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019) and satisfy the *Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211 (9th Cir. 1989) integrated enterprise factors—especially centralized control of labor relations." (*Id.*)

In reply, American argues that "[t]he Response does nothing to strengthen Plaintiff's lackluster attempt to hold [American] accountable for Envoy's alleged discriminatory and/or retaliatory acts in failing to hire him" because "Plaintiff offers no case or statutory law to substantiate that [the relevant passages in the FAC], either individually or cumulatively, could possibly suffice to show at the pleading stage that [American] and Envoy are joint employers or integrated enterprises." (Doc. 69 at 3.) American further argues that "Plaintiff essentially admits the lack of a joint employer or integrated enterprise relationship between [American] and Envoy by claiming [American] merely 'influence[s]'—not controls—Envoy pilots' career progression (which [American] denies)" because "the pertinent inquiry is whether [American] exercised day-to-day control over Envoy's employment relations, not whether it could influence them." (*Id.*, cleaned up.) Last, American contends that Plaintiff "completely misrepresents" the consent decree, which does not suggest that the two entities are operationally interdependent. (*Id.* at 3-4.)

## B.    **Analysis**

Courts "have an obligation where the petitioner is pro se, particularly in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of any doubt." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012). Conclusory and vague allegations, however, will not support a cause of action. *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). A liberal interpretation may not supply essential elements of the claim that were not initially pled. *Id.*

Under Title VII, an entity can be held liable for discrimination if it is an "employer" of the plaintiff. 42 U.S.C. § 2000e-2(a). A separate corporate entity may be held liable for the discriminatory acts of an employing entity only under limited circumstances. For example, under the "integrated enterprise" doctrine, courts will treat two entities as one

employer for liability purposes "if they have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control." *Morgan*, 884 F.2d at 1213.  In performing this analysis, "courts will consider all four of these factors together, but centralized control of labor is often considered the most important factor, . . . the key issue [being] which entity had the ultimate authority over employment decisions concerning the individual alleging discrimination." *Barrera v. Prima Frutta Packing, Inc.*, 2025 WL 950379, *3 (E.D. Cal. 2025).  Meanwhile, under the joint-employer doctrine, if a separate corporate entity exercises "control over the terms and conditions of employment" of another entity, then it may be subject to liability "for discrimination relating to those terms and conditions." *Glob. Horizons*, 915 F.3d at 637.  However, "even if a joint-employment relationship exists, one joint employer is not automatically liable for the actions of the other." *Id.* at 641.  "Liability may be imposed for a co-employer's discriminatory conduct only if the defendant employer knew or should have known about the other employer's conduct and 'failed to undertake prompt corrective measures within its control.'" *Id.*

### 1.    Integrated Enterprise

The FAC does not allege facts sufficient to establish that Envoy and American constituted an integrated enterprise.  Most important, the FAC does not allege facts sufficient to give rise to an inference that Envoy's and American's labor relations were under "centralized control."  As discussed in detail in Part II of this order, the FAC affirmatively alleges that Envoy has "ultimate authority" over its hiring procedures and that American had no direct involvement.  This is fatal to the notion that American and Envoy shared centralized control of their labor relations.  *Hutchinson*, 2013 WL 1340051 at *11 ("Wadlund was free to hire and fire his own employees and while American Family could dictate which of Wadlund's employees could represent American Family products to the public, American Family could not dictate who Wadlund ultimately hired for nonsales positions or fired from his agency.  Accordingly, the most critical factor, centralized control of labor relations similarly weighs against an integrated enterprise.").

Indeed, as American notes, Plaintiff appears to admit in its response brief that American does not actually "control" Envoy's labor relations—instead, Plaintiff merely contends that American "*maintains influence* over pilots' career progression through its flow-through pathway." (Doc. 68 at 2, emphasis added.) But influence is not the standard; control is. *Huse v. Auburn Honda*, 2005 WL 1398521, *4 (E.D. Cal. 2005) ("Plaintiffs' evidence of American Honda's general control over Auburn Honda also fails to establish an employment relationship between plaintiffs and American Honda. The pertinent inquiry is whether American Honda exercised day-to-day control over Auburn Honda's employment relations, not whether it could influence Auburn Honda in other respects. Therefore, whether American Honda could limit the number of cars it distributed to Auburn Honda or whether American Honda could conduct quality inspections of the dealership and inquire into customer satisfaction is irrelevant. These types of activities do not create an employment relationship."). Additionally, the FAC does not allege, or even indirectly suggest, that the two entities employ common management.

To be sure, the FAC alleges several facts that suggest Envoy and American have interrelated operations, which is one of the relevant factors under *Morgan*. For example, the FAC alleges that Envoy "provides flight services, including aircraft and staff," to American customers (Doc. 63 ¶ 36), that American pays Envoy pilots (*id.* ¶ 38), that American hires Envoy pilots through a "pilot program" (*id.* ¶¶ 39-43), and that Envoy advertises its relationship to American through a variety of marketing materials (*id.* ¶¶ 9-11). But even assuming such facts are sufficient to satisfy the "interrelated operations" factor under *Morgan*, the FAC still fails to satisfy the key "control" factor as well as other factors.

### 2. Joint-Employer Doctrine

For now-familiar reasons, the FAC fails to allege facts sufficient to establish that Envoy and American were joint employers such that American may be held liable for Envoy's alleged acts of discrimination. The FAC fails to allege facts sufficient to show that American exerted control over the terms and conditions of Plaintiff's employment.

1    *Courtland*, 2013 WL 3894981 at *5.  *See also Singh v. 7-Eleven*, Inc., 2007 WL 715488,

2    *3-7 (N.D. Cal. 2007) (plaintiff failed to establish principal-agency relationship sufficient

3    for liability under joint-employer theory because franchisee had sole control over hiring,

4    firing, and supervision of employees).  This theory also fails for the additional reason that

5    the FAC does not allege facts sufficient to establish that American knew or should have

6    known about Envoy's challenged conduct and failed to undertake prompt corrective

7    measures within its control, as required under *Global Horizons*.

8    IV.    <u>Leave To Amend</u>

9         American argues that leave to amend should be denied on futility grounds.  (Doc.

10   67 at 10.)  In response, "Plaintiff requests leave to amend under Rule 15(a), which provides

11   that leave should be freely granted where justice so requires.  This principle is especially

12   vital in pro se pleadings made in good faith."  (Doc. 68 at 5.)[5]

13        The Court agrees with American that Plaintiff's request for leave to amend should

14   be denied on futility grounds.  The Court provided specific guidance to Plaintiff in the June

15   2, 2025 order regarding the type of additional facts Plaintiff would need to allege to survive

16   dismissal.  (Doc. 61 at 9-13.)  The Court wrote that in light of that guidance, it was "not

17   inclined to grant leave to file another amended complaint if the first amended complaint is

18   found to be deficient."  (*Id.* at 13.)  This approach is consistent with the applicable Ninth

19   Circuit authorities.  *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (affirming

20   dismissal with prejudice where district court had instructed pro se plaintiff regarding

21   deficiencies in prior order dismissing claim with leave to amend); *Ascon Props., Inc. v.*

22   *Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("The district court's discretion to deny

23   leave to amend is particularly broad where plaintiff has previously amended the

24   complaint.").  Because Plaintiff was unable to craft a viable complaint against American

25   even after receiving the guidance in the June 2, 2025 order, there is no reason to believe

26   that providing him with yet another amendment opportunity—where his claims in the FAC

27

28   _____

     [5]    Plaintiff also disputes the sufficiency of American's meet-and-confer efforts before
     filing the motion to dismiss (Doc. 68 at 5), but those objections are unavailing.

against American remain subject to dismissal for the same reasons his claims in the original complaint against American were subject to dismissal—would produce a different result.

V.    Plaintiff's Supplement

On September 3, 2025, nearly two months after he filed his response brief, Plaintiff filed a document entitled "Notice of Filing Supplemental Exhibit D In Support Of Plaintiff's Response To Defendant's Motion to Dismiss." (Doc. 80.) Plaintiff attached two documents that he contends he obtained from Envoy as part of the discovery process in this case: (1) the "Protected Pilot Agreement—Intercompany Employment Policy"; and (2) the "Protected Pilot Agreement—Tripartite." (Doc. 80-1.)

American has moved to strike this filing as unauthorized. (Doc. 82.) American also contends that, at any rate, the attached materials do not support Plaintiff's position, both because they are outside the scope of the pleadings and because they "in no way relate[] to or ha[ve] bearing on Plaintiff's failure to exhaust his administrative remedies against [American] or the fact [American] was not the employer to which Plaintiff applied." (*Id.*) American also requests an opportunity to submit a sur-reply. (*Id.*)

Although American is correct that Plaintiff's supplement was an unauthorized filing, the Court declines to strike it in light of Plaintiff's *pro se* status. Instead, the Court will liberally construe it as an attempt to identify new facts that Plaintiff would plead if provided with another grant of leave to amend.

Plaintiff's supplement does not provide a basis for allowing further amendment. Even assuming, contrary to American's arguments regarding the Railway Labor Act (Doc. 82 at 3), that Plaintiff's proffered documents could theoretically be used to support Plaintiff's arguments regarding administrative exhaustion, the integrated-enterprise exception, and/or the joint-employer doctrine, they do not actually provide support for those arguments. Indeed, the "Protected Pilot Agreement—Tripartite" reiterates that although "American has agreed to make a certain number of positions in future new hire pilot training classes at American available to Eagle pilots," "*Eagle and ALPA [Air Line Pilots Association] will determine the process, sequence, and qualifications pursuant to*

*which Eagle pilots will be eligible for the opportunities to be made available* pursuant to this Agreement and jointly communicate the results of that process to American." (Doc. 80-1 at 3, emphasis added). Elsewhere, the document adds: "AA's agreement and obligation is solely to offer pilot positions in each such class *to Eagle pilots identified to AA by Eagle and ALPA* as next in line for such offers." (*Id.*, emphasis added.) Finally, the document also emphasizes that "neither this Agreement nor the Preferential Hiring Program created pursuant to this Agreement shall constitute evidence that American is a 'joint employer' with Eagle of any pilots, or be admitted into evidence in any proceeding in which such joint employment issue is raised." (*Id.* at 5.) These statements are consistent with, and indeed underscore, the conclusions set forth in earlier portions of this order.

Accordingly,

**IT IS ORDERED** that:

1.    American's motion to strike (Doc. 82) is **denied**.

2.    American's motion to dismiss (Doc. 67) is **granted**. Plaintiff's claims against American are dismissed without leave to amend, and American is dismissed as a party.

Dated this 9th day of October, 2025.

Dominic W. Lanza
United States District Judge